Michael Elsner, Esq. VA Bar # 41424 *(pro hac vice forthcoming)*
John M. Eubanks, Esq. MD Bar # 401050004 *(pro hac vice forthcoming)*
**MOTLEY RICE LLC**
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
Email: melsner@motleyrice.com; jeubanks@motleyrice.com

F. Franklin Amanat, Esq. NY Bar # 2447936 *(pro hac vice forthcoming)*
**MOTLEY RICE LLC**
800 Third Avenue, Suite 2401
New York, NY 10022
Telephone: (212) 577-0052
Email: famanat@motleyrice.com

Samuel F. Mitchell, Esq. CO Bar # 51253 *(pro hac vice forthcoming)*
Steven C. Mitchell, Esq. AZ Bar # 009775 *(pro hac vice forthcoming)*
**MITCHELL & MITCHELL LLC**
1150 Hungryneck Blvd., Suite C-170
Mount Pleasant, SC 29464
Email: sam@mitchellfirmllc.com; steve@mitchellfirmllc.com

Tab Turner, AR Bar # 85158 *(pro hac vice forthcoming)*
Emilio A. Cazares, CA Bar # 324810
Cassie N. Holloway, CA Bar #328284
**TURNER & ASSOCIATES, P.A.**
1001 B Ave., suite 308
Coronado, CA 92118
Ph.: (619) 537-0007
Fax: (619) 537-0079
Email: tab@tturner.com; emilio@tturner.com; cassie@tturner.com

**ATTORNEYS FOR PLAINTIFFS**

1

## U.S. SOUTHERN DISTRICT COURT CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| GENEVA A. CAMARENA, Individually, and on behalf of the Estate of ENRIQUE S. CAMARENA, Deceased; ENRIQUE S. CAMARENA, JR.; DANIEL CAMARENA; ERIK R. CAMARENA; BERTHA C. TAMAYO; NORMA URIAS; MYRNA CAMARENA; SANDRA CAMARENA; DIANA C. LUCERO; AND CYNTHIA WIGGINTON as the proposed Personal Representative of the Estate of ERNESTO CAMARENA, Deceased; | Civil Action No. **'25CV0651 CAB SBC** |
| *Plaintiffs,* | **COMPLAINT** |
| *v.* | **DEMAND FOR JURY TRIAL** |
| Rafael CARO-QUINTERO (aka "Rafa, ""Cesar," "El Senor," "Don Rafa," "R1," "El Hombre," "28," "the Old Man," "El Canoso," "El Crespo," and "El Pleve"); Ernesto FONSECA-CARRILLO (aka "Don Neto"); Miguel Angel FELIX-GALLARDO; and SINALOA CARTEL f/k/a Mexican Federation f/k/a Guadalajara Cartel, | |
| *Defendants.* | |

2

## **INTRODUCTION**

Members of the Guadalajara Cartel n/k/a the Sinaloa Cartel, Mexico's most significant and violent drug traffickers, abducted Drug Enforcement Administration ("DEA") Special Agent Enrique "Kiki" S. Camarena (hereinafter referred to as "Kiki" or "Camarena"), and his colleague, pilot Alfredo Zavala-Avelar (hereinafter referred to as "Zavala-Avelar"). The kidnappings occurred in the middle of the day, right outside the United States Consulate, on the streets of Guadalajara, Jalisco, Mexico. Over the next several days, Cartel interrogators brutally tortured Kiki and Zavala-Avelar in efforts to extract information about the DEA's knowledge of the Cartel's operations. The torture ended with the violent murders of Kiki and Zavala-Avelar, a brazen act meant to intimidate and deter the governments of the United States and Mexico from investigating and disrupting cartel criminal acts.

About a month after the kidnapping, Mexican and U.S. authorities recovered Kiki and Zavala-Avelar's bodies in a shallow grave on a rural farm sixty (60) miles southeast of Guadalajara. Their bodies were wrapped in plastic sheets, blindfolded, bound, and gagged. Later forensic examinations documented extensive injuries suffered by both men, who died from similar fatal head and neck blows.

During his 11-year career with the DEA, Special Agent Camarena received two Sustained Superior Performance Awards, a Special Achievement Award and, posthumously, the Administrator's Award of Honor, the highest award granted by DEA[1]. In 1998, the DEA instituted Red Ribbon Week. It is among the largest drug prevention programs in the country.[2] The program is celebrated annually from

---

[1] Expressing Appreciation for Enrique "Kiki" Camarena, H.R. 1115 March 10, 2010.

[2] United States Drug Enforcement Administration, *Red Ribbon Week*, Available at https://www.dea.gov/redribbon.

October 23-31 to help preserve Special Agent Camarena's memory and further the cause for which he gave his life, the fight against drug crime and addiction.[3]

In the immediate aftermath of the kidnappings, U.S. and Mexican authorities undertook a multi-year investigation of Kiki's assailants, leading to the arrests of Defendants Rafael Caro-Quintero, Ernesto Fonseca-Carrillo, and Miguel Angel Felix-Gallardo. Evidence presented at U.S. and Mexican criminal trials proved these Defendants, who collectively controlled the Guadalajara Cartel, planned and directed Kiki's kidnapping, torture, and murder with the help of co-conspirators. Witnesses, forensic evidence, and audio tapes of the interrogations describe the crimes committed by Defendants and their co-conspirators in chilling detail.

This action seeks to hold Rafael Caro-Quintero, Ernesto Fonseca-Carrillo, Miguel Angel Felix-Gallardo, and the Sinaloa Cartel f/k/a Mexican Federation f/k/a Guadalajara Cartel, responsible for the crimes committed against Camarena.

<strong><u>PARTIES</u></strong>

**Plaintiffs**

1. Geneva A. Camarena (hereinafter "Mika") is Special Agent Enrique Camarena's widow and the Personal Representative of his Estate. She is the mother of Plaintiffs Enrique S. Camarena, Jr. (hereinafter "Enrique Jr."), Daniel Camarena (hereinafter "Daniel"), and Erik R. Camarena (hereinafter "Erik"). Mika resides in the Southern District of California and is a U.S. citizen.

2. Special Agent Enrique Camarena (hereinafter "Kiki") was a U.S. citizen at the time of his murder.

---

[3] Expressing Appreciation for Enrique "Kiki" Camarena, H.R. 1115 March 10, 2010.

3. Mika and Kiki first met at De Anza Junior High School in Calexico, California.[4] They began dating during their junior year of high school and were engaged in 1969. The couple married on March 14, 1970, at Our Lady of Guadalupe church in Calexico, California.[5]

4. From 1969 to 1971, Kiki served as a U.S. Marine stationed at Camp Pendleton in Southern California. After his military service, Kiki joined the Calexico Police Department.

5. Shortly after joining the Calexico Police Department, Kiki joined DEA. His first post was in his hometown of Calexico, California.[6]

6. Kiki realized the dangers of being an undercover DEA agent soon after joining. One evening, three or four individuals who knew Kiki was DEA, recognized Kiki while he was working undercover; they proceeded to beat Kiki severely – breaking several ribs and a thumb.

7. Kiki was subsequently transferred by DEA to Fresno, California. Seeking to fulfill his promise to try and make a difference, Kiki put in a request to be transferred to Guadalajara, Mexico. DEA granted the request, and Kiki and his family – Mika (pregnant with Erik), Enrique Jr., and Daniel – moved to Guadalajara.

8. Kiki was resolute in his efforts to shield his family from the volatile nature of their situation. He did not discuss his work with his family, and the only indication that he ever provided Mika about the dangers of Guadalajara was when Mika would tell him, "I prayed for you today," and Kiki would respond, "I'm glad you did."

9. Mika brings this action individually and on behalf of Kiki's Estate.

---

[4] De Anza Junior High School has since been renamed "Enrique Camarena Junior High School". https://ec.cusdk12.org/About-Us/index.html

[5] Fifteen years later, Our Lady of Guadalupe church would serve as the church where thousands would gather to mourn the murder, and death, of Kiki.

[6] https://ec.cusdk12.org/documents/Who_is_Enrique_Kiki_Camarena.pdf

10. Plaintiff Enrique Camarena, Jr. is Mika and Kiki's eldest son, and he resides in the Southern District California. Enrique Jr. is a U.S. citizen and a Southern District of California resident.

11. Plaintiff Daniel Camarena is Mika and Kiki's second son, and he resides in Idaho. Daniel is a U.S. citizen.

12. Plaintiff Erik Camarena is Mika and Kiki's youngest son, and he resides in the Southern District of California. Erik is a U.S. citizen.

13. Plaintiff Bertha C. Tamayo is Kiki's sister. Bertha is a dual U.S. and Mexican citizen residing in the Southern District of California.

14. Plaintiff Norma Urias is Kiki's sister. Norma is a U.S. citizen, and she resides in the Northern District of California.

15. Plaintiff Myrna Camarena is Kiki's sister. Myrna is a U.S. citizen, and she resides in the Southern District of California.

16. Plaintiff Sandra Camarena is Kiki's sister. Sandra is a U.S. citizen, and she resides in Arizona.

17. Plaintiff Diana C. Lucero is Kiki's sister. Diana is a U.S. citizen, and she resides in the Southern District of California.

18. Plaintiff Cynthia Wigginton is the Proposed Personal Representative of the Estate of Ernesto Camarena, Camarena's brother. Ms. Wigginton is a U.S. citizen residing in Arizona. Ernesto Camarena, who died in 2014, was a U.S. citizen and resided in California at the time of his death.

**Defendants**

19. Defendant the Sinaloa Cartel f/k/a Guadalajara Cartel f/k/a Mexican Federation is a criminal drug trafficking organization based in Mexico. In the 1970s, following Mexican counter-trafficking operations, major drug traffickers from the Mexican state of Sinaloa began relocating their operations to the city of Guadalajara, in the state of Jalisco. During the late 1970s and early 1980s, drug lords Rafael Caro-

Quintero, Ernesto Fonseca-Carrillo, Miguel Angel Felix-Gallardo, and Juan José Esparragoza-Moreno began trafficking drugs collaboratively. The alliance became known as the Mexican Federation (Federation for short), or the Guadalajara Cartel. Striking distribution deals with Colombian drug cartels, the Guadalajara Cartel began trafficking cocaine into the U.S. in significant quantities, earning enormous profits. In addition to cocaine, the Cartel supplied large volumes of marijuana produced in Mexico. At the height of its operations, the Guadalajara Cartel controlled nearly all drug trafficking into the U.S., which was estimated to be worth billions of dollars annually.

20.    The United States Treasury Department, Office of Foreign Assets Control ("OFAC"), first designated the Sinaloa Cartel f/k/a the Guadalajara Cartel on April 15, 2009, and it has renewed the designation annually. OFAC recognizes the Sinaloa Cartel and Guadalajara Cartel as the same entity on its Specially-Designated Nationals and Blocked Persons list ("SDN List").[7]

21.    The Sinaloa Cartel "is one of the world's most powerful drug cartels and is one of the largest producers and traffickers of fentanyl and other illicit drugs to the United States. [The Sinaloa Cartel] has used violence to murder, kidnap, and intimidate civilians, government officials, and journalists."[8]

22.    Defendant Rafael Caro-Quintero is a founding member of the Guadalajara Cartel. In April 1985, Mexican and Costa Rican authorities arrested Caro-Quintero in Costa Rica on charges related to Kiki's murder and drug

---

[7] *See* Alphabetical Listing of Blocked Persons, Blocked Vessels, Specially Designated Nationals, Specially Designated Terrorists, Specially Designated Global Terrorists, Foreign Terrorist Organizations, and Specially Designated Narcotics Traffickers, 74 Fed. Reg. 29742-01, at *29847 (June 23, 2009); Notice of OFAC Sanctions Actions, 86 Fed. Reg. 72307-01(Dec. 21, 2021).

[8] U.S. Department of State, Office of the Spokesperson, Fact Sheet, "Designation of International Cartels," (Feb. 20, 2025), available at https://www.state.gov/designation-of-international-cartels/.

trafficking.[9] Mexican courts convicted Caro-Quintero of Kiki's murder and of drug trafficking charges, and sentenced him to 40 years in prison.[10] In 2000, the U.S. designated Caro-Quintero as a significant foreign narcotics trafficker under the Foreign Narcotics Kingpin Designation Act (Kingpin Act), 21 U.S.C. §§ 1901 *et seq*.[11]

23.    On February 20, 2025, the United States Secretary of State determined that the Defendant, Sinaloa Cartel, "ha[s] committed or ha[s] attempted to commit, pose[s] a significant risk of committing, or ha[s] participated in training to commit acts of terrorism that threaten the security of United States nationals or the national security, foreign policy, or economy of the United States," and accordingly, designated the Sinaloa Cartel a Foreign Terrorist Organization pursuant to section 219 of the Immigration and Nationality Act, as amended.[12]

24.    The intent of designating the Sinaloa Cartel a Foreign Terrorist Organization "is to protect our nation, the American people, and our hemisphere.

---

[9] Fourth District Judge for Federal Criminal Proceedings in the State of Jalisco, Mexico, Full Compliance with Execution of Amparo Criminal Proceedings 83/2010, 82/85-II, 203/1985, 118/1985, 86/1987, 170/1985, 204/1985, 75/1986, 108/1986, 249/1986, 283/1985, at pg. 389 (hereinafter cited as "Amparo Proc.").

[10] Criminal Proceedings, Criminal Case 82/85 and accumulated cases 118/85, 283/85, 204/85, 28/85, and 229/85 against Rafael Caro Quintero and Ernesto Rafael Fonseca Carrillo, at pgs. 418, 3139-3146 (hereinafter cited to as "Sentencia Proc. 82/85").

[11] *See* Letter to Congressional Leaders Reporting on Sanctions Under the Foreign Narcotics Kingpin Designation Act from President William J. Clinton (June 1, 2000) (on file with the United States Government Printing Office).

[12] Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 Fed. Reg. 10030 (Feb. 20, 2025).

That means stopping the campaigns of violence and terror by these vicious groups both in the United States and internationally."[13]

25.    Despite his conviction, Caro-Quintero continued to direct drug trafficking operations while in prison in Mexico. In August 2013, Caro-Quintero was unexpectedly released from prison after a Mexican appellate court determined that his state murder charges related to Camarena were incorrectly tried in a Mexican federal court.[14] Mexican authorities immediately appealed the ruling; the appeals court reinstated his conviction and issued a subsequent arrest warrant for Caro-Quintero, who went into hiding after his release from prison. After almost ten years on the run, in July 2022, the Mexican military re-arrested Caro-Quintero.[15]

26.    United States authorities have indicted Caro-Quintero in the Eastern District of New York for, among other things, being the "drug kingpin responsible for a murder conspiracy targeting those who posted a threat to his drug trafficking organization, including DEA Special Agent Enrique Camarena, who bravely worked to stop traffickers like the defendant from flooding our country with dangerous narcotics."[16]

---

[13] U.S. Department of State, Secretary of State, Marco Rubio, Press Statement, "Terrorist Designations of International Cartels" (Feb. 20, 2025), available at https://www.state.gov/terrorist-designations-of-international-cartels/.

[14] CBS News, *Rafael Caro Quintero, infamous Mexican drug lord, released after 28 years in prison* (Aug. 9, 2013), available at https://www.cbsnews.com/news/rafael-caro-quintero-infamous-mexican-drug-lord-released-after-28-years-in-prison/.

[15] U.S. Department of Justice, Office of Public Affairs, *Statement From Attorney General Merrick B. Garland on Capture of Rafael Caro-Quintero* (July 15, 2022), available at https://www.justice.gov/opa/pr/statement-attorney-general-merrick-b-garland-capture-rafael-caro-quintero.

[16] *U.S. v. Rafael Caro Quintero, et al.,* Case No. 15-cr-208, ECF No. 57 (E.D.N.Y. Feb. 7, 2020); *U.S. v. The Real Property and Premises Known as: Deed No. 18,877, et al.,* Case No. 19-cv-5748, ECF No. 1, p. 6 (E.D.N.Y. July 22, 2021) (in connection with the continuing criminal enterprise, Rafael Caro Quintero is

27.    For years, the U.S. sought Caro-Quintero's extradition to the United States; on February 27, 2025, the Mexican government expelled Caro-Quintero to the United States, where he will face charges in the Eastern District of New York.[17]

28.    Defendant Caro-Quintero was arraigned in the Eastern District of New York on February 28, 2025.[18]

29.    While he was in prison and a fugitive, Caro-Quintero's drug trafficking faction worked closely with the members of the Sinaloa Cartel.[19] U.S. authorities have publicly identified these persistent leadership and operational links between Caro-Quintero's organization and the Sinaloa Cartel.[20]

---

charged with "the murder of DEA Special Agent Enrique 'Kiki' Camarena on or about February 1985"); *see also* U.S. Attorney's Office, Eastern District of New York, Press Release, *Leader of Guadalajara and Sinaloa Cartels Charged with Conspiring to Murder a DEA Agent as Part of Continuing Criminal Enterprise*, (Apr. 12, 2018), available at https://www.justice.gov/usao-edny/pr/leader-guadalajara-and-sinaloa-cartels-charged-conspiring-murder-dea-agent-part.

[17] *U.S. v. Rafael Caro-Quintero,* Case No. 15-cr-208, ECF No. 87 (E.D.N.Y. Feb. 28, 2025).

[18] *Id.* at ECF No. 88 (E.D.N.Y. Feb. 28, 2025).

[19] *U.S. v. The Real Property and Premises Known as: Deed No. 18,877, et al.,* Case No. 19-cv-5748, ECF No. 11 (Default Judgment and Partial Decree of Forfeiture) (E.D.N.Y. Apr. 15, 2021); DEA, "United States District Court Orders Forfeiture of Real Estate Purchased by Mexican Cartel Leader Rafael Caro Quintero with Proceeds of his Drug Trafficking Organization," April 15, 2021, available at https://www.dea.gov/press-releases/2021/04/15/united-states-district-court-orders-forfeiture-real-estate-purchased ("These properties, described in the [Government's] civil forfeiture complaint filed on October 11, 2019, were purchased by Rafael Caro Quintero ('RCQ') with drug proceeds generated by the Caro Quintero drug trafficking organization, a faction of the Mexican organized crime syndicate known as the Sinaloa Cartel.").

[20] U.S. Department of Treasury, Office of Foreign Assets Control, *Treasury Sanctions the Network of Drug Lord Rafael Caro Quintero*, June 2013, available at https://home.treasury.gov/news/press-releases/jl1981.

30.    Defendant Ernesto Fonseca-Carrillo, also known as "Don Neto", is another founding member of the Guadalajara Cartel. In April 1985, Mexican authorities arrested Fonseca-Carrillo in Puerto Vallarta, Mexico, charging him with Camarena's murder.[21] A search of Fonseca-Carrillo's home uncovered recordings of Camarena's interrogation and torture. Later that year, Mexican courts found Fonseca-Carrillo guilty of Camarena's kidnapping and murder and sentenced him to 40 years in prison.[22] In 2016, Fonseca-Carrillo successfully petitioned a Mexican court to release him under house arrest because of his age and health.[23] Fonseca-Carrillo continues to serve his sentence.

31.    Defendant Miguel Angel Felix-Gallardo is another founding member of the Guadalajara Cartel. In 1989, Mexican authorities arrested Felix-Gallardo and convicted him of Camarena's kidnapping and murder, sentencing the drug lord to 40 years in prison.[24]

32.    After the arrests of Guadalajara Cartel leaders Rafael Caro-Quintero, Ernesto Fonseca-Carrillo, Miguel Angel Felix-Gallardo, and Juan José Esparragoza-Moreno, the Guadalajara Cartel devolved into regional-based drug trafficking syndicates. Joaquín Archivaldo "El Chapo" Guzmán-Loera, a former Guadalajara Cartel lieutenant, co-founded the Sinaloa Cartel with Ismael Mario "El Mayo" Zambada-Garcia. Juan José Esparragoza-Moreno would later control elements of the Sinaloa Cartel with Guzman and Zambada, working closely with Caro-Quintero.

33.    Under Guzman, Zambada, and Esparragoza-Moreno's control, the Sinaloa Cartel would become one of the largest drug trafficking organizations in the

---

[21] Amparo Proc. at p. 292.

[22] Sentencia Proc 82/85 at p. 3111.

[23] A.P., *Mexico court orders drug lord Ernesto Fonseca Carrillo freed,* Mar. 31, 2017, available at https://apnews.com/general-news-9ff3b63adb0a46acbe37e0254c855b0d.

[24] Sentencia Proc. 82/85, p. 3111.

world. The Cartel's decentralized leadership structure and flexible alliances with other trafficking suboperators are the basis for its longevity and resilience.

34.    Joaquín Archivaldo Guzmán-Loera, also known as "El Chapo," is a founding member of the Sinaloa Cartel. In 1993, Mexican authorities arrested Guzman in Guatemala and sentenced him to 20 years in prison for unrelated murder and drug trafficking crimes. In 2001, Guzman escaped from a Mexican prison and remained at large until he was recaptured in 2014. After escaping a second time, Guzman was re-arrested in 2016.

35.    In 2017, U.S. authorities extradited Guzmán to the United States to face drug trafficking and other murder charges in the Eastern District of New York. In 2019, Guzmán was convicted and sentenced to life in prison plus 30 years and ordered to forfeit more than $12 billion in assets. He is currently incarcerated at Florence ADMAX USP in Florence, Colorado, under BOP Reg. No. 89914-053.

36.    The U.S. first designated the Sinaloa Cartel as a significant foreign narcotics trafficker in April 2009.[25]

## JURISDICTION AND VENUE

37.    Jurisdiction exists under 28 U.S.C. § 1331 for this civil action arising under the laws of the United States. Specifically, 18 U.S.C. § 2334(a), which states that "[a]ny action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent." Several Plaintiffs in this Action—Geneva Camarena, the Estate of Kiki Camarena, Enrique Jr., Erik

---

[25] Pres. George W. Bush, *Letter to Congressional Leaders Reporting on Sanctions Pursuant to the Foreign Narcotics Kingpin Act* (May 31, 2001), available at https://www.govinfo.gov/content/pkg/PPP-2001-book1/pdf/PPP-2001-book1-doc-pg602.pdf; U.S. Department of Treasury, Office of Foreign Assets Control, *Sanctions Pursuant to The Foreign Narcotics Kingpin Designation Act*, available at https://ofac.treasury.gov/media/6791/download?inline.

Camarena, Bertha Tamayo, Myrna Camarena, and Diana Lucero—live in the Southern District of California.

38.    Jurisdiction also arises under 28 U.S.C. §1332(a)(2) for this civil action between citizens of a State and citizens or subjects of a foreign State, where the amount in controversy exceeds $75,000, exclusive of interest and costs.

39.    The Anti-Terrorism Act further states that "a suit for recovery of damages under section 2333 of this title shall not be maintained unless commenced within 10 years after the date the cause of action accrued," "[s]ubject to subsection (b)." 18 U.S.C. § 2335(a). Subsection (b) provides that the "time of the absence of the defendant from the United States or from any jurisdiction in which the same or a similar action arising from the same facts may be maintained by the plaintiff, or of any concealment of the defendant's whereabouts, shall not be included in the 10-year period set forth in subsection (a)." 18 U.S.C. § 2335(b). Defendants the Sinaloa Cartel, Ernesto Fonseca-Carrillo, and Miguel Angel Felix-Gallardo are in Mexico, and have been since the murder of Kiki. Defendant Rafael Caro Quintero was expelled to the United States on February 27, 2025, having been outside the jurisdiction of the United States prior to that date. There is no provision of Mexican law similar to the federal Anti-Terrorism Act. Therefore, this action is not time-barred.

40.    Venue is proper and convenient in this District under 28 U.S.C. §1391(b).

## **FACTUAL ALLEGATIONS**
### **History of the Guadalajara Cartel**

41.    The Guadalajara Cartel, formed in the late 1970s and early 1980s by Defendants Miguel Ángel Félix-Gallardo, Rafael Caro-Quintero, and Ernesto Fonseca-Carrillo, was a precursor to many modern Mexican drug cartels. In the 1980s, the Guadalajara Cartel dominated the U.S. drug trade, pioneering a

partnership with Colombian cocaine suppliers and operating large-scale marijuana growing operations.

42.     Following the murder of Special Agent Camarena and the arrests of Defendants Rafael Caro-Quintero, Ernesto Fonseca-Carrillo, and Miguel Angel Felix-Gallardo, the Guadalajara Cartel devolved into regional-based cartels headed by former senior operatives of the Guadalajara Cartel. One faction formed around "El Chapo" Guzmán and "El Mayo" Zambada's leadership and became known as the Sinaloa Cartel. Juan José Esparragoza-Moreno would join the Sinaloa Cartel's leadership and form a close working relationships with Caro-Quintero and his organizations.

43.     "The DEA's top operational priority is to defeat the two Mexican drug cartels – the Sinaloa cartel and Jalisco New Generation cartel [spinoff of Sinaloa cartel] – that are responsible for driving the poisoning epidemic in the United States" today.[26]

44.     Historically, Mexican drug cartels have operated through a form of decentralized leadership, affiliating with and outsourcing drug operations to criminal gangs, other cartel operators, and co-conspirators. These fluid working alliances, which produce illicit drugs, traffic them internationally, and launder drug proceeds, result in constantly evolving relationships between the cartels and their sub-operators and can mean cartels both collaborate and compete with each other, sometimes violently and often at the same time.

---

[26]  Statement of Anne Milgram, Administrator, Drug Enforcement Administration, at a Hearing Entitled, *Countering Illicit Fentanyl Trafficking*, Before the Senate Committee on Foreign Relations, United States Senate (Feb. 15, 2023), available at https://www.foreign.senate.gov/imo/media/doc/f4597c23-de04-fa71-e612-bcbc49b6826c/021523_Milgram_Testimony.pdf.

**Kidnapping, Interrogation, and Murder of Camarena**

45.    During 1983 and 1984, Special Agent Camarena and his pilot Zavala-Avelar conducted periodic surveillance flights across central and northern Mexico, studying cartel marijuana growing operations.

46.    In November 1984, Mexican and U.S. authorities raided Caro-Quintero's marijuana plantation in northern Chihuahua, which resulted in the seizure and destruction of marijuana "that was collectively valued at approximately $5 billion."[27]

47.    According to Mexican co-conspirators, Caro-Quintero learned of Kiki and Zavala-Avelar's aerial surveillance and swore revenge against Kiki and his pilot for disrupting operations.[28]

48.    On the afternoon of February 7, 1985, five gunmen working for the Guadalajara Cartel abducted Kiki off the streets of Guadalajara.[29] The kidnapping, which occurred directly across the street from the DEA's offices inside the U.S. Consulate, occurred as Kiki walked to his vehicle in broad daylight.[30] He was on his way to meet his wife Mika for lunch at a nearby restaurant. So as not to raise any suspicions, one of Kiki's kidnappers presented credentials from the Federal Security Directorate and indicated that the company commander would like to speak with Kiki.[31] Kiki's kidnappers then wrestled him into the back seat of a small car at gun

---

[27]*Juan Ramon Matta-Ballesteros v. U.S.,* Case No. 16-cv-2596, ECF No. 37 (C.D. Cal. May 22, 2017).

[28] Sentencia Proc. 82/85, pgs. 46-49; *see also Vasquez-Velasco v. U.S.,* 2019 WL 1359732, at *2 -3 (C.D. Cal. Mar. 25, 2019).

[29] Sentencia Proc. 82/85, p. 34.

[30] *Id.* at p. 35.

[31] *Id.*

point[32] and drove him 1.1 miles down the street to Defendant Rafael Caro-Quintero's home, located at 881 Lope de Vega, Guadalajara.[33]

49.    Later that same afternoon, other cartel operatives kidnapped Zavala-Avelar near the Guadalajara airport. The kidnappers took Zavala-Avelar to the same villa at 881 Lope de Vega.

50.    At the villa, the Defendants and their co-conspirators interrogated and tortured Camarena and Zavala-Avelar for over 30 hours.[34] To prolong his torture, Defendants summoned a doctor to administer drugs to Camarena to keep him conscious during the beatings.

51.    Sometime on February 9, 1985, Cartel members and their co-conspirators murdered both men. On March 5, 1985, Mexican and U.S. authorities recovered the men's bodies on a ranch approximately sixty (60) miles southeast of Guadalajara, in a shallow grave.[35] The bodies, wrapped in plastic sheets, had been blindfolded, gagged, and bound.[36] Additional physical evidence suggests that the

---

[32] *Id.* at p 66.

[33] Honoring Special Agent "Kiki" Camarena, Red Ribbon Week, *The Life of DEA Special Agent Kiki Camarena*, available at https://earth.google.com/web/data=MkEKPwo9CiExQzVIVHMxTHlfXzZiZ1paazhwTldsQl9pRGVENDRLeEISFgoUMEVDQTg0OUU1MzE1Q0E1ODMwQzMgAQ.

[34] Arther F. McEvoy, *The Martyrdom and Avenging of Enrique Camarena-Salazar: A review of Caselaw and Scholarship After Thirty Years*, available at https://rss.swlaw.edu/sites/default/files/2017-04/SWT104.pdf.

[35] *See* Expressing Appreciation for Enrique "Kiki" Camarena, H.Res. 1115 March 10, 2010; George A. Suber, Joint Base Myer-Henderson Hall ASAP Prevention Coordinator, *The Story of the Red Ribbon: Let Us Not Forget*, U.S. Army, Oct. 28, 2022, available at https://www.army.mil/article/261580/the_story_of_the_red_ribbon_let_us_not_forget.

[36] *United States v. Jesus Felix-Gutierrez, et al.,* Case No. 87-422, Doc. No. 3349 at 12:2-6 (USA Closing Argument) (C.D. Cal. Oct. 31, 1988).

murderers had initially buried the men elsewhere, likely in a Guadalajara city park, and later moved the bodies to the rural farm.[37]

52.    A search of Ernesto Fonseca-Carrillo's residence in Puerto Vallarta, Mexico, discovered audiotape recordings of Kiki's interrogation and torture. U.S. authorities authenticated the voices of Caro-Quintero and Kiki and confirmed that the information Kiki disclosed during the beatings was information only known to DEA agents.[38] The tapes also document the severe physical and emotional stress, anxiety, and fear Kiki endured during this unconscionable experience.[39]

53.    Kiki's kidnapping and murder were "performed to further the cartel's drug smuggling activities by intimidating the DEA from continuing its enforcement activities against the cartel's drug trafficking. Such actions were also intended to intimidate local police and drug agencies, thereby inhibiting them from cooperating with the DEA. In this context, the murder of American citizens has an equally direct and adverse impact on our nation's security interest in combatting the importation and trafficking of illegal narcotics."[40]

**Substantial Physical, Emotional, and Psychological Damages Inflicted on Camarena Family as Result of Guadalajara Cartel's Abduction, Torture, and Murder of Kiki.**

54.    Kiki's family experienced significant pain and suffering as a result of his abduction and murder.

55.    On the day of Kiki's abduction, Mika went to the local Chinese restaurant in Guadalajara, where she had planned to meet Kiki for lunch. She waited for him at the restaurant and eventually ate and left, assuming that his work had

---

[37] Sentencia Proc. 82/85, pgs. 71, 80.

[38] *U.S. v. Rafael Caro-Quintero, et al.,* Case No. 87-cr-422, ECF No. 3320 at 1179:23-1181:21 (C.D. Cal. May 25, 1993).

[39] Copia 2 and Copia 4.

[40] *U.S. v. Vesquez-Velasco*, 15 F.3d 833, 841 (9th Cir. 1994).

interfered with their lunch plans. Later that afternoon, she took Enrique Jr. to get a haircut, she fed the boys, took them to the park, and got them ready for bed. Unbeknownst to her, during those hours, her husband was being brutally tortured. Mika went to bed and awoke the next morning to learn that Kiki had not come home.

56.     Mika immediately called Kiki's partner and asked if he knew where Kiki was. Kiki's partner answered with a question of his own, "[d]id Kiki join you for lunch?" Immediate fear and terror-struck Mika, as she instantly knew that her husband was missing, and DEA had no idea where he was.

57.     DEA began an all-out search for Kiki.

58.     While they anxiously awaited Kiki's return, Mika and her children were confined to their home under the 24/7 watch and protection of U.S. and Mexican authorities, who positioned themselves both inside and outside their home. They all sat by the phone anxiously waiting for the ransom call that would never come.

59.     Mika was terrified for her husband's and family's safety during this time. Wanting to protect her children, Mika sent them to stay with her sister (their aunt) in San Diego. The situation had become so dangerous that the boys could not walk from their front door to the armored cars waiting to transport them to the airport, nor were they even allowed to walk up the steps of the private plane waiting for them at a secure airfield: the boys were lifted up by DEA agents inside their house; the agents then sprinted, with the boys under their arms like footballs, into the armored vehicles waiting on the street; these armored vehicles then sped, with a fully armed police escort, to a secure airfield, where a private plane was waiting for them; and then, once at the plane, the plane dropped its door, and the agents again lifted the boys up and sprinted with them on to the plane.

60.     After about a week apart from her boys, and at the encouragement of law enforcement, Mika traveled to the U.S. to join her children. At this point, every

aspect of her life, and her children's lives, was being controlled and managed by DEA.

61.    As each day passed, Mika grew more and more concerned for her husband's safety. On March 5, 1985, almost a month after the kidnapping, Mika received news that her worst nightmares had come true – DEA agents informed her that they had located Kiki's body, and that he had been tortured and murdered.

62.    Mika's pain and trauma continued to compound, because she knew that she needed to tell her children (ages 11, 6, and 4) that their father was not coming home. And while she did the best she could to protect them, the situation was made ever more difficult and painful because everyone knew who they were and wanted to speak with them about the abduction and murder.

63.    For instance, one day after school, one of the boys came home crying, with a copy of *Time* Magazine in his hand, asking, "mommy, is this true?" An image of Kiki Camarena was on the cover of the magazine, and the article described his kidnapping and murder.

64.    Mika experienced significant emotional trauma as a result of Kiki's kidnapping and murder, requiring many years of therapy. Her anguish and loss have also led to other health complications. Currently, Mika continues to need professional assistance.

65.    Enrique Jr., who was eleven at the time, also experiences significant pain and suffering as a result of his father's—his hero's—kidnapping and murder. Three months before his father's kidnapping and murder, while Kiki was tucking Enrique Jr. into bed, he asked his son what he wanted to be when he grew up, and Enrique Jr. responded, proudly, "I want to be you."

66.    Kiki's whole demeanor changed from happy-go-lucky to stern and adamant. Kiki explained to Enrique Jr. that the job was "too dangerous," and he

would not let his son fall asleep until he promised that he would not join a law enforcement agency. Enrique Jr. kept his promise.

67. The morning following Kiki's kidnapping, Enrique Jr. knew something was wrong. While it was not unusual for his father to not be home in the morning when he went to school, it was unusual for his mother to tell him that he didn't have to go to school that morning, because, in the past, unless he was very ill, Enrique Jr. would always have to go to school. Enrique Jr. soon began to notice what was going on, as his mother closed and locked the door to her room (something he had never seen her do before), and a number of federal agents showed up and unpacked machine guns and recording devices. Soon he was transported, by armored vehicle and armed guards, to the United States.

68. From then on, Enrique Jr. worried daily about his father, mother, and younger brothers.

69. On March 8, 1985, Enrique Jr. accompanied his mother to receive his father's body at the San Diego North Island VIP Air Terminal. "A Marine Corps band, an 18-man honor guard, and a score of federal agents, each with a black diagonal mourning ribbon across the gold badge on the breast pockets of their dark suits, also met the plane."[41]

70. President Ronald Reagan called Mika following the discovery of Kiki's body to offer his deepest sympathies and tell her and Enrique Jr. that her husband, his father, died for his country and that they should be proud of him for all their life because he gave his life for all of us.

---

[41] Hilmer Anderson, UPI Archives (Mar. 8, 1985), *The body of narcotics agent Enrique Camarena, slain by…*, available at https://www.upi.com/Archives/1985/03/08/The-body-of-narcotics-agent-Enrique-Camarena-slain-by/5865479106000/.

71.    In addition to his two Sustained Superior Performance Awards and Special Achievement Award, which Kiki received during his eleven-year service with DEA, Kiki was posthumously awarded the DEA Administrator's Award of Honor, the highest award granted by DEA.[42]

72.    The horror and devastation of his father's kidnapping and murder compounded years later, when, while in middle school, Enrique Jr. found a transcript of the tapes of his father's torture and interrogation. Enrique Jr. read his father begging and pleading with the interrogators to not hurt his family.

73.    Kiki always told Enrique Jr. to be the man of the house when he was gone, and these expectations, coupled with what he read in the transcripts, have weighed heavily upon him ever since. Enrique Jr. has undergone therapy to help cope with his emotional pain and suffering.

74.    Enrique Jr. remembers how, during the ordeal in Mexico and later while living with his aunt, his mother's personality changed. Her loud, normal laughter became subdued, and she withdrew.

75.    Daniel was six years old at the time of his father's abduction. He, too, has suffered extreme emotional distress related to the loss of his father.

76.    On days when Kiki would leave for work, Daniel would wait for him by the front door to come home, and after Kiki went missing, Daniel would wait there and look out the front window expecting to see him return. It was not until the first birthday after his father's death that Daniel understood he would never see his father again through the front window, walking up to the house.

77.    Daniel has received professional assistance to help cope with his emotional pain and suffering.

---

[42] United States Drug Enforcement Administration, *The Enrique (Kiki) S. Camarena Story,* available at https://www.dea.gov/red-ribbon/kiki-red-ribbon-history.

78.    Erik, who was four years old when his father was kidnapped, has struggled to recall his father. Sometimes he does not know if his memories of him are from his own experiences or if these memories are based on stories told to him by others. Erik's early vivid memories consist of his mother's frequent crying. While in elementary school, Erik would start crying in class. His classmates generally knew of his father's experience, and that weighed on him daily. He was frequently sad and grieving with his family. Erik has never had the ability to grieve the loss of his father privately, which has greatly affected him.

79.    Today, as an adult, Erik continues to struggle. He's unable to watch violent movies and television shows without them triggering an emotional response and the question, is this what happened to my father?

80.    Erik doesn't often speak about his father. When he does, he gets very emotional.

81.    Kiki's sisters were quite close to their older brother.

82.    Myrna Camarena viewed Kiki as her role model and father-figure. He looked out for her as she was growing up and helped her get a job with DEA.

83.    While working in Turkey, Myrna Camarena was told by her boss that her "brother has been taken; he was kidnapped." Myrna collapsed at the news. When she awoke, she began the long journey home, flying from Istanbul to Calexico. Throughout the lengthy travel, she was in an information blackout. Was her brother ok? Had he been found? Was there a ransom? What would the situation be like at home?

84.    When she landed in Calexico, the gravity of the situation hit. She was flooded by the media, everyone wanted a comment, everyone wanted a picture, the house was surrounded. She couldn't escape from the attention and grief. This has caused, and continues to cause, Myrna significant emotional pain and suffering.

85.     Collectively, it was decided that Bertha Camarena would be the one to respond to the media. The press bombarded Bertha from all angles including but not limited to, flying a helicopter around the house to try and see who was coming and going in the home. Bertha, her sisters, and her family were afforded no respect for their privacy during this time, and they were not allowed to grieve in private; everywhere they went, someone knew Kiki or someone heard about him and wanted to speak with Bertha about him.

86.     This was, and continues to be, extremely difficult for Bertha; however, calling her (and Kiki's) youngest sister, Diana Lucero, to notify her of what happened to Kiki, was excruciatingly heart-breaking.

87.     Diana was in college at the time, and she didn't believe it when Bertha told her that Kiki was missing. In a sort of self-protection mode, Diana's mind refused to accept what her sister had just told her, and it was not until a day or two later that Diana realized that something was wrong. After that, everything was kind of a blur, as the family got together and the sisters anxiously waited for any news about their brother, only to be eventually told that he had been tortured and murdered.

88.     Norma Urias considered her brother to be her protector, the one that made sure nothing ever happened to her or her sisters, and so when she was informed by DEA that her brother had been murdered, she went into complete and total shock. Norma was unable to deal with daily life for some period of time and has suffered tremendous personal physical and emotional loss as a consequence of her brother's abduction, torture, and murder.

89.     While it has been 40 years since her brother's abduction, torture, and murder, in many ways it feels as though it was just yesterday for Kiki's sister, Sandra Camarena. She remembers the knock on the door from Border Patrol Agent and friend, Jim Wilson, who told her that she needed to call her sister, Bertha.

90.     After speaking with Bertha, Sandra went into shock and lost control. Unfortunately, because of the significance of her brother's case, Sandra is forced to re-experience this trauma regularly, because everyone seemingly knows who she is, who her brother is, and everyone wants to talk to her about Kiki and her experience. There are frequent reminders of this nightmare for Sandra. As a direct and proximate result of the Defendants' intentional, egregious, wanton disregard for her brother's life, Sandra has suffered, and continues to suffer, significant emotional injuries.

91.     Due to the loss of their older brother, both Bertha and Myrna underwent counseling and suffered from severe emotional injuries.

92.     In response to Kiki's murder, the National Family Partnership started the Red Ribbon Campaign in 1988 to educate young people about the dangers of drugs and to encourage them to pledge to lead a drug-free life, to honor the sacrifices made by Kiki.[43] Red Ribbon Week is the longest-standing drug use prevention program in the United States, and it has brought drug awareness to millions of Americans.[44] Several of the Plaintiffs have actively participated, and continue to actively participate, in Red Ribbon Week every year; however, this participation and annual recognition is painful, as it forces Plaintiffs to re-live the murder of Kiki.

### Camarena's Autopsy Results

93.     Dr. Jerry D. Spencer, head of the U.S. Navy's Department of Forensic Sciences, performed an autopsy on Camarena's body on March 7, 1985. He determined Camarena's death was caused by "blunt force and penetrating injuries of the head" and found the manner of death to be "homicide."[45]

---

[43] *Id.*; "A Resolution Supporting the Goals and Ideals of Red Ribbon Week During the Period of October 23 through October 31, 2024." S. Res. 873 Sep. 25, 2024).

[44] *Id.*

[45] Dr. Jerry D. Spencer, U.S. Navy, Chairman, Department of Forensic Sciences, Autopsy (Mar. 7, 1985).

94.    Dr. Spencer's report found that Kiki sustained:

1.    Fractures of left maxilla, left frontal, and left parietal bones, extending into sphenoid and ethmoid bones.

2.    Fractures two (2) of right maxilla extending into right sphenoid, right frontal and right parietal bone areas.

3.    Fractures of left ribs --- 5, 6, 7, and 8.

4.    Fractures of right ribs --- 7, 8, 9, and 10.

5.    Penetrating injury, left parietal bone (internal and external beveling).[46]

95.    The injuries further suggested a puncture through the skull and into the brain, likely caused by steel rebar or tire iron, resulting in Camarena's death.[47]

96.    Before the U.S. Navy's forensic exam, Mexican medical authorities also performed an autopsy on Camarena's body. According to Dr. Luis Salgado Salinas and Tomas Alejandro Herrera-Perez, forensic examiners from Mexico's General Directorate of Expert Services, Department of Forensic Medicine, Camarena died from "trauma craniocerebral and asphyxiation due to suffocation."[48] Mexican forensic examiners also confirmed both men were beaten in the abdomen and had been bound and gagged.

---

[46] *Id.*
[47] *Id.*
[48] Sentencia Proc. 82/85, pg. 430.

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
## CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a)
## AGAINST DEFENDANTS FOR VIOLATIONS OF
## 18 U.S.C. § 2333 CONSTITUTING
## ACTS OF INTERNATIONAL TERRORISM

97.     Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

98.     Plaintiffs are U.S. nationals injured by reason of an act of international terrorism, and they seek damages under 18 U.S.C. § 2333. Plaintiffs' family member, Enrique S. Camarena, was a United States citizen that was kidnapped, tortured, and murdered by Defendants in Mexico.

99.     Plaintiffs were victimized by acts of "international terrorism" as defined by 18 U.S.C. § 2331(1), which states:

"**(1)** the term "international terrorism" means activities that —

**(A)** involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the U.S. or of any State, or that would be a criminal violation if committed within the jurisdiction of the U.S. or of any State;

**(B)** appear to be intended –

**(i)** to intimidate or coerce a civilian population;

**(ii)** to influence the policy of a government by intimidation or coercion; or

**(iii)** to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

**(C)** occur primarily outside the territorial jurisdiction of the U.S., or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to

intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

100. Defendants committed these acts directly against Kiki, injuring and killing him. Defendants conspired to commit these acts and other supporting acts that provided logistics, financing, safe houses and safe havens, transportation, communications, funds, transfer of funds, other in-kind material benefit, false documentation or identification including alias names, weapons, explosives, non-medical training, and ammunition, all in furtherance of the Guadalajara Cartel's continuing criminal enterprise and terroristic activities.

101. Defendants' conduct appears to have been,[49] and was, intended to intimidate or coerce a civilian population, and/or to influence the policy of the United States and Mexican governments by intimidation, and/or to affect the conduct of the United States and Mexican governments by the kidnapping and murder of DEA Special Agent Enrique "Kiki" Camarena in Guadalajara, Mexico. This heinous crime and the use of such brutality was intended to further the continuing criminal enterprise and terroristic activity of the Guadalajara Cartel.

102. Defendants murdered Kiki and/or knowingly aided and abetted or conspired to provide material support to the perpetrators of such acts. Defendants also aided, abetted, conspired, or otherwise engaged in or provided material support for the acts of international terrorism, including but not limited to providing material support and/or aiding and abetting assistance to the Guadalajara Cartel. This material support and/or aiding and abetting of acts of international terrorism allowed Defendant to carry out the injuries and wrongful death of Kiki.

---

[49] *See Weiss v. Nat'l Westminster Bank,* 993 F.3d 144, 161 (2d 2021) (internal citation omitted) ("Whether a defendant 'appeared' to have intended its activities to intimidate or coerce is not a question of the defendant's subjective intent but rather a question of what its intent objectively appeared to be.").

103. Defendants knowingly and specifically targeted, kidnapped, interrogated, tortured, and murdered United States DEA Special Agent Enrique "Kiki" Camarena.

104. Defendants' activities involved violent and dangerous acts to human life that were, and are, a violation of the criminal laws of the U.S. and the State of California.

105. Kiki was kidnapped, tortured, and murdered in retribution for the DEA's investigation, seizure, and destruction of marijuana grown at the Buffalo ranch. These heinous acts were intentionally undertaken to interfere with any law enforcement investigation concerning the Defendants continuing criminal enterprise and to deter U.S. and Mexican authorities from conducting any investigation into Defendants' activities in the future.

106. Defendants' activities occurred outside the territorial jurisdiction of the U.S. and transcended international boundaries.

107. Defendants' acts are, therefore, acts of international terrorism as defined under 18 U.S.C. §2331(1).

108. Defendants intentionally and purposefully hid their involvement in the kidnapping, torture, and murder of Kiki and concealed their identities and physical whereabouts. They purposefully hid Kiki's body in two unmarked graves in an effort to pin the crimes on other suspects.

109. As a designated Kingpin organization and specifically designated Kingpin drug traffickers and Foreign Terrorist Organization, Defendants proximately caused the deaths and injuries described herein and are liable for the criminal acts, including acts of international terrorism, the aiding and abetting of international terrorism, conspiring to commit further acts of international terror, engaging in a joint continuing criminal enterprise to conduct international terrorism

through illegal schemes, and/or the material support and sponsorship of international terrorism.

110.    WHEREFORE, Plaintiffs demand judgment against Defendants for their past and future mental pain and suffering, anguish, emotional distress, loss of solatium, loss of companionship, society, affection, consortium, and guidance, including treble damages under 18 U.S.C. 2333, plus interest, costs, attorneys' fees, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate Plaintiffs.

## SECOND CLAIM FOR RELIEF
## ASSAULT AND BATTERY

111.    Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

112.    Pursuant to Cal. Civil Code § 43, the claims for assault and battery survive Kiki's death.

113.    Kiki's Estate brings this claim for assault and battery against the Defendants, because Defendants unlawfully, violently, willfully, maliciously, and without just provocation on the part of Kiki, assaulted and battered and/or knowingly conspired to assault and batter Kiki by kidnapping and torturing him, causing serious bodily harm and death.

114.    As a direct and proximate result of the assault and battery, Kiki suffered serious and permanent bodily injury that resulted in his death.

115.    As a further direct and proximate cause of the assault and battery described above, Kiki suffered great physical pain and mental anguish and was murdered.

116.   As a further direct and proximate result of the Defendants' actions, Kiki suffered emotional and traumatic injuries. He also incurred expenses, lost wages and lost employment opportunities.

117.   Defendants acted intentionally, with an evil mind, guided by an evil hand, which warrants punitive damages.

118.   WHEREFORE, Kiki's Estate demands judgment in its favor against Defendants and demand damages in an amount to be determined by a jury for damages arising out of assault and battery, including punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate the Camarena Estate and Plaintiffs.

### THIRD CLAIM FOR RELIEF
### WRONGFUL DEATH

119.   Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

120.   Plaintiffs bring this claim for wrongful death against the Defendants, because Defendants caused Kiki's death through such wrongful acts and/or omissions as knowingly, purposefully, directly and indirectly, assisting, aiding, abetting, facilitating, materially supporting, incentivizing and/or recklessly disregarding the intentional commission of killing of a civilian, and United States DEA Special Agent, and other murderous attacks and shockingly egregious acts of international terrorism against Plaintiffs and Kiki, and such other wrongful actions and omissions as set forth herein.

121.   As a direct and proximate result of the wrongful actions and/or omissions of Defendants, as set forth herein, Kiki suffered serious emotional and bodily injuries resulting in the death on the date as referenced herein.

122.    As a direct and proximate result of the wrongful actions and/or omissions of Defendants, and Kiki's resulting wrongful death, Kiki's relatives and other survivors, have suffered pecuniary and other losses including but not limited to loss of earnings and services of pecuniary value, as well as funeral expenses.

123.    Plaintiffs, as Kiki's surviving relatives are entitled to recover damages as a result of the wrongful acts and/or omissions of Defendants, and Kiki's resulting wrongful death, as plead herein pursuant to pertinent Wrongful Death statutes, including Cal. Civ. Pro. § 377.20, *et seq.*

124.    As a direct and proximate result of the wrongful actions and/or omissions of Defendants, and Kiki's resulting wrongful death, Kiki's surviving relatives have suffered and will continue to suffer both economic and non-economic damages including but not limited to permanent physical and emotional distress, severe trauma, and lasting physical, emotional, and psychological injuries, for which they have and will continue to incur actual damages including but not limited to ongoing medical and other expenses.

125.    WHEREFORE, Plaintiffs demand judgment in their favor against Defendants, and demand damages in an amount to be determined by a jury, not less than the statutory amount, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate the Plaintiffs.

## FOURTH CLAIM FOR RELIEF
## SURVIVAL ACTION

126.    Plaintiff, Geneva A. Camarena, on behalf of the Estate of Enrique Camarena, adopts and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

127.    Plaintiff Geneva A. Camarena, on behalf of the Estate of Enrique Camarena brings this survival action against Defendants, because Defendants caused Kiki's pain, suffering, and eventual death through such wrongful acts and/or omissions as knowingly, purposefully, directly and indirectly, assisting, aiding, abetting, facilitating, materially supporting, incentivizing and/or recklessly disregarding the intentional commission of civilian death and injury, and shockingly egregious acts of international terrorism against Plaintiffs and Kiki, and such other wrongful actions and omissions as set forth herein.

128.    As a direct and proximate result of the wrongful, intentional, malicious, reckless, criminal, grossly negligent and negligent acts of Defendants, as described herein, Kiki was placed in a severe, prolonged, extreme, traumatic, apprehension of harmful, offensive unwarranted bodily contact, injury, and assault. Kiki suffered intensely severe and offensive harmful bodily contact, personal injury, and battery; including but not limited to extreme fear, terror, anxiety, emotional and psychological distress, knowledge of impending death, physical and emotional trauma, and intentionally inflicted physical pain.

129.    As a direct and proximate result of the wrongful, intentional, malicious, reckless, criminal acts of Defendants, as described herein, Kiki suffered damages including conscious pain and suffering, severe trauma, fear, anxiety, permanent physical and emotional distress, ultimate loss of life and life's pleasures, companionship and consortium, loss of family, career, earnings and earning capacity, loss of accretion to his estate, medical expenses and other immeasurable items of damages to be shown at trial. Kiki's Estate herein seeks and is entitled to survival damages for Kiki who was tortured and killed.

130.    Kiki experienced conscious pain and suffering and fear of injury during his abduction, torture, and murder by Defendants.

131.    Kiki was tortured and interrogated. Before he was killed, he made it known, as heard and read in his interrogation tapes, that he was fearful.[50] He had time to comprehend the situation and understand that death was potentially near. He was fully aware of the danger, felt pain when beaten and suffocated, and experienced fear for not only himself but for his family members. [51] Kiki died as result of suffocation by asphyxiation and a cranio-encephalic traumatism.[52]

132.    Kiki is entitled to all compensatory, punitive, and other damages permitted under the pertinent survival statutes against the Defendants.

133.    WHEREFORE, Kiki's Estate demands a judgment in favor of the Estate against Defendants and demand damages in an amount to be determined by a jury, not less than the statutory amount, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate the Plaintiff.

## FIFTH CLAIM FOR RELIEF
## NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

134.    Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

135.    Pursuant to Cal. Civil Code § 377.30, this claim survives the death of Kiki.

136.    All Plaintiffs bring this claim for negligent and/or intentional infliction of emotional distress against Defendants, because Defendants facilitated, assisted, aided, abetted, materially supported, and incentivized acts of murder and wrongful

---

[50] Recording of Camarena's torture, Copia 2, pg. 13:208.
[51] *Id.* at Copia 2, pg. 2:28.
[52] Autopsy Report, pg. 8.

death, specifically, the murdering of United States DEA Special Agent Enrique S. Camarena and other shockingly egregious acts of international terrorism discussed herein.

137.    Family Member Plaintiffs are entitled to a claim for negligent and/or intentional infliction of emotional distress despite not being present at the scene. Cases arising out of other terrorist attacks have removed the presence requirement because it is "sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present." *Murphy v. Islamic Rep. of Iran,* 740 F. Supp. 2d 51 (D. D.C. 2010) (citing *Heiser II v. Islamic Rep. of Iran,* 659 F. Supp. 2d 20 (D. D.C. 2009)). The attack on an innocent man amounts to such an extreme and outrageous conduct that the Defendants knew such an act would inflict severe emotional harm on Kiki's family.

138.    Defendants knowingly, and purposefully, directly and indirectly aided and abetted, intentionally facilitated, and/or recklessly caused the heinous murder that resulted in Kiki's death and substantial emotional injuries his family members.

139.    Defendants intended or knew or should have known, that their conduct would lead to the killing of or injury to innocent persons and resulting severe emotional distress. Defendants intended, knew, or should have known that the murderous attack committed by them would kill, maim, and/or permanently injure Kiki and, leave devastated family members to grieve for their losses with ongoing physical, psychological and emotional injuries and ongoing post-traumatic stress disorder.

140.    The actions of Defendants were unconscionable and done with an intentional, malicious, willful, and/or reckless disregard for the rights and life of Kiki, and his surviving family members.

141.    As a direct and proximate cause of Defendants' intentional misconduct and/or reckless disregard for human life, Plaintiffs have suffered and will continue

to suffer severe, debilitating, permanent emotional, and psychiatric disorders, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counseling and long-term care.

142. Defendants, by engaging in this intentional, unlawful conduct, intentionally, grossly negligently, or negligently inflicted emotional distress upon the Plaintiffs.

143. WHEREFORE, Plaintiffs demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Court deems appropriate to compensate the Plaintiffs.

## SIXTH CLAIM FOR RELIEF
## LOSS OF CONSORTIUM

144. Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

145. Plaintiff Geneva A. Camarena and Enrique S. Camarena were married at the time of the attack.

146. Plaintiff Enrique S. Camarena, Jr., and Enrique S. Camarena were in a father-child relationship at the time of the attack.

147. Plaintiff Daniel Camarena and Enrique S. Camarena were in a father-child relationship at the time of the attack.

148. Plaintiff Erik R. Camarena and Enrique S. Camarena were in a father-child relationship at the time of the attack.

149. Plaintiff Bertha C. Tamayo was in a sibling relationship with Enrique S. Camarena at the time of the attack.

150. Plaintiff Norma Urias was in a sibling relationship with Enrique S. Camarena at the time of the attack.

151. Plaintiff Myrna Camarena was in a sibling relationship with Enrique S. Camarena at the time of the attack.

152. Plaintiff Sandra Camarena was in a sibling relationship with Enrique S. Camarena at the time of the attack.

153. Plaintiff Diana C. Lucero was in a sibling relationship with Enrique S. Camarena at the time of the attack.

154. Plaintiff Ernesto Camarena was in a sibling relationship with Enrique S. Camarena at the time of the attack.

155. As a result of the wrongful acts of the Defendant, the above-Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, affection and assistance, all to the detriment of the marital, parental, and sibling relationship.

156. All the injuries and damages were caused solely and proximately by the Defendants.

157. WHEREFORE, Plaintiffs demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury for damages arising out of the wrongful death, survival, loss of solatium, and/or loss of services, plus interest, costs and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate the Plaintiffs.

## SEVENTH CLAIM FOR RELIEF
## CIVIL CONSPIRACY

158.   Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

159.   Under California law, "persons who … share with the immediate tortfeasors a common plan or design in its perpetration" may incur "tort liability co-equal with the immediate tortfeasors." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (Cal. 1994).

160.   A civil conspiracy requires the formation and operation of a conspiracy resulting in damage to the plaintiff from acts done in furtherance of the conspiracy.

161.   Defendants CARO-QUINTERO, FONSECA-CARRILLO, and FELIX-GALLARDO formed and operated Defendant SINALOA CARTEL (f/k/a Guadalajara Cartel) for the purpose of trafficking illicit narcotics—including, but not limited to, cocaine and marijuana—into the United States.

162.   The Defendants, personally and also by and through Defendant SINALOA CARTELO (f/k/a Guadalajara Cartel) further conspired to engage in an intimidation campaign against the DEA to prevent the DEA from interfering in the conspiracy to traffic illicit narcotics into the United States.

163.   Kiki's kidnapping on February 7, 1985 was conducted in furtherance of the conspiracy to intimidate the DEA from engaging in actions that would circumvent the conspiracy's common plan of trafficking illicit narcotics into the United States.

164.   Members of the SINALOA CARTEL (f/k/a Guadalajara Cartel) initially abducted Kiki as part of the conspiracy.

165. Defendant CARO-QUINTERO's home at 881 Lope de Vega, Guadalajara, was utilized to hide, torture, and ultimately kill both Kiki and Zavala-Avelar on or about February 9, 1985 following their abductions.

166. Authorities located audiotape recordings of Kiki's interrogation and torture at Defendant FONSECA-CARRILLO's residence in Puerto Vallarta, Mexico.

167. Defendant FELIX-GALLARDO was one of the founding members of the SINALOA CARTEL (f/k/a Guadalajara Cartel) and was intimately involved in all details related to the conspiracy to traffic narcotics into the United States and to engage in intimidation of law-enforcement authorities to further this common plan of the conspiracy.

168. As a proximate result of the civil conspiracy engaged in by the Defendants, Kiki was abducted, tortured, and murdered, and his family members have borne that loss over the ensuing 40 years.

169. A conspiracy "renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity." *Applied Equipment Corp.*, 7 Cal. 4th at 511.

170. All the injuries and damages were caused solely and proximately by the Defendants.

171. WHEREFORE, Plaintiffs demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury for damages arising out of the Defendants' civil conspiracy, survival, loss of solatium, and/or loss of services, plus interest, costs and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate the Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

1. Enter judgment against each Defendant and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

2. Enter judgment against each Defendant and in favor of Plaintiffs for punitive damages in amounts to be determined at trial;

3. Enter judgment against each Defendant and in favor of Plaintiffs for pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

4. Enter judgment against each Defendant and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333;

5. Enter judgment against each Defendant and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333; and

6. Grant such other and further relief as justice requires.

Plaintiffs demand trial by jury on all issues so triable.


Dated: March 20, 2025          By:  /s/Cassie N. Holloway

Michael Elsner, VA Bar #41424
*(pro hac vice forthcoming)*
John M. Eubanks, MD Bar #401050004
*(pro hac vice forthcoming)*
**MOTLEY RICE LLC**
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
Email: melsner@motleyrice.com
Email: jeubanks@motleyrice.com

F. Franklin Amanat, NY Bar #2447936
*(pro hac vice forthcoming)*
**MOTLEY RICE LLC**
800 Third Avenue, Suite 2401
New York, NY 10022
Telephone: (212) 577-0052
Email: famanat@motleyrice.com

Samuel F. Mitchell, CO Bar #51253
*(pro hac vice forthcoming)*
Steven C. Mitchell, AZ Bar #009775
*(pro hac vice forthcoming)*
**MITCHELL & MITCHELL LLC**
1150 Hungryneck Blvd., Suite C-170
Mount Pleasant, SC 29464
Email: sam@mitchellfirmllc.com
Email: steve@mitchellfirmllc.com

Tab Turner, AR Bar # 85158
*(pro hac vice forthcoming)*
Emilio A. Cazares, CA Bar # 324810
Cassie N. Holloway, CA Bar #328284
**TURNER & ASSOCIATES, P.A.**
1001 B Ave., Suite 308
Coronado, CA 92118
Ph.: (619) 537-0007
Fax: (619) 537-0079
Email: emilio@tturner.com
Email: cassie@tturner.com

ATTORNEYS FOR PLAINTIFFS